```
                   UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF INDIANA
                       SOUTH BEND DIVISION
```

D.L., with and by his mother,           )
TRACY LANDIS,                           )
                                        )
                    Plaintiffs          )
                                        )
            vs.                         )   CAUSE NO. 3:06-CV-229RM
                                        )
WARSAW COMMUNITY SCHOOLS,               )
                                        )
                    Defendant           )

## OPINION AND ORDER

D.L., a freshman at Warsaw Community High School, is a Twenty-first Century Scholar: he will be eligible for a scholarship award to attend an Indiana college or university if he graduates from an Indiana high school with at least a 2.0 grade point average, does not use illegal drugs, does not commit any crimes or delinquent acts, and does not get suspended or expelled from school for illegally using or possessing alcohol or drugs. D.L. wants to attend an Indiana college or university, but can't afford to do so without a Twenty-first Century scholarship.

On Friday, January 27, 2006, D.L. ate lunch in the school cafeteria. Later that day, he was summoned to assistant principal Steve Ferber's office because of suspicion that he had participated in a drug deal earlier in the cafeteria. Authorities searched D.L. and his locker, but found no drugs. D.L. consented to a drug test, but the school had no drug test performed.

1

Mr. Ferber telephoned D.L.'s mother, Tracy Landis, and told her D.L. would be suspended from school for one day for failure to comply with administrative personnel who sought information from him. Mr. Ferber said the school had a security camera videotape of the drug transaction, but refused Ms. Landis' request to review that video tape.

The next Monday, the school's principal, Dr. Jennifer Brumfield, told Ms. Landis that the suspension wouldn't affect D.L.'s attendance record and that Ms. Landis would be allowed to see the video tape. Later that day, the assistant principal telephoned Ms. Landis to report that the school was suspending D.L. for 10 days and recommending expulsion. Ms. Landis understood the suspension was based on student reports that D.L. had gotten high at school and had sold the drugs in the alleged cafeteria drug transaction. The assistant principal wouldn't tell Ms. Landis which students had made those reports, but said the school was working on arrangements for her to see the video tape. Ms. Landis took D.L. to the local hospital for drug testing at a local hospital; the results were negative for drugs.

On February 14, Ms. Landis and D.L. received a notice of right to appear at expulsion meeting and a notice of decision regarding continued suspension from school, which continued D.L.'s suspension. The notice said Mr. Ferber recommended D.L.'s expulsion based on the allegation that D.L. was "involved in drug transaction/possession of marijuana."

2

Ms. Landis requested an expulsion meeting and the meeting was held on February 28. Mr. Ferber, D.L., and Ms. Landis testified. Typed and unsigned statements that Mr. Ferber said he had taken from 6 students at the school were introduced into evidence. Ms. Landis and D.L. asked to be able to cross-examine the 6 students because the typed statements were indecipherable, but their request was denied. Mr. Ferber made several references to the videotape, but didn't produce or present the tape; Ms. Landis and D.L. weren't allowed to see the tape.

Mr. Ferber testified that the School had received information, apparently confirmed by the videotape, that D.L. and another student (T.M.) had sought out another student to purchase marijuana. Mr. Ferber testified that the videotape showed D.L. pointing to the alleged supplier (D.G.) in the main area of the cafeteria, and D.L. and T.M. then walked to where D.G. was. After the conversation, D.L. went to the food line, and D.G. placed what appeared to be marijuana in T.M.'s binder. Mr. Ferber also testified that D.L. had shown other students in the cafeteria marijuana that he had in his left pocket, then smelled his hand after returning it to his pocket. Again, Mr. Ferber testified, the videotape seemed to corroborate that information. Mr. Ferber testified that he had information that D.L. had acquired the marijuana in a math class from a Hispanic girl. Some students reported hearing D.L. say something about getting high before fifth period.

Mr. Ferber testified that D.L. had warned the others in the cafeteria to be careful lest the security camera catch the activity. Mr. Ferber said the videotape showed D.L. look at the camera and then hold his chair up in front of the camera.

Ms. Landis complained that she hadn't been allowed to view the videotape, and noted that no marijuana had been found on D.L. when he was searched and that a private drug screen on D.L. proved negative. Mr. Ferber explained the refusal to produce the videotape: "Our administrative team has spoken in regards to that and for the protection of the other students around that area for their protection we have opted not to show that as public evidence." Ms. Landis also asked for the opportunity to cross-examine the students who had given information "and ask them why they saying what they did."

D.L. denied most of what Mr. Ferber had said about him. He said he didn't speak with the alleged supplier; when Mr. Ferber said the videotape showed him doing so, D.L. said he didn't remember. D.L. denied pulling anything out of his pocket. Mr. Ferber explained that he had compared the students' statements to the videotape to try to tell what happened, and Ms. Landis again expressed her belief that not allowing her to see the videotape was unfair. Ms. Ellis said that she hadn't seen it either. D.L. denied having said anything about getting high before fifth period.

D.L. testified that he had lifted the chair on Thursday, not on the day of the alleged Friday drug transaction. Mr. Ferber then produced a time- and date-stamped still photo drawn from the videotape, showing D.L. holding the chair in

4

front of the camera (Mr. Ferber appears to have tried to blot out the other students' faces in the photo).

On March 1, the expulsion examiner granted the request that D.L. be expelled until the beginning of the 2006-2007 school year. She summarized the evidence and her finding as follows:

> According to the statements presented [D.L.] was involved in arranging for the purchase of marijuana in the cafeteria at the high school. [D.L.] was described as having pointed out from whom another student could purchase marijuana. He also accompanied the student to the "supplier", and spoke with him briefly. It was also reported that [D.L.] was in possession of marijuana, showed it to other students, sniffed it, and compared the amount to what was received during the transaction. The statements indicated that [D.L.] paid for his marijuana a couple of days before. The information in the statements was corroborated by the security camera video and that was referred to but not shown to ensure the safely of the other students in view.
> . . . [D.L.] denied involvement in a drug transaction and denied that he was in possession of marijuana at school. He was not found in possession and he was screened for drugs on January 31, 2006 and that showed no drugs in his system. The statement from his counselor, who he had been seeing for one month, indicated that there has been no indication that [D.L.] is using drugs.
> On the basis of the above, I find and conclude that the student . . . [w]as in possession of marijuana or something represented to be marijuana at school and was accessory to a drug transaction in the cafeteria. . . .
> I, therefore, determine and give notice that this matter be resolved as follows: The expulsion granted as requested.

Ms. Landis and D.L. appealed the expulsion decision in a timely manner.

On March 15, Ms. Landis and D.L. filed this suit against the Warsaw Community Schools under 42 U.S.C. § 1983 in state court, seeking a temporary restraining order and a preliminary injunction overturning the expulsion decision,

5

alleging that the Schools violated D.L.'s procedural due process rights under the Fourteenth Amendment of the U.S. Constitution. The state court issued a temporary restraining order returning D.L. to the classroom pending a hearing set for April 12. After the Schools removed the case to this court, the court extended the restraining order until today's ruling, as the parties agreed. At the scheduled April 24 hearing on the preliminary injunction request, the parties agreed to a consolidation of the hearing on the preliminary injunction application with the trial on the merits, and the court so ordered. *See* FED. R. CIV. P. 65(a)(2). The court has jurisdiction over this suit pursuant to 28 U.S.C. § 1343(a)(3).

After suit was filed, the school board selected an intermediate level hearing officer to hear D.L.'s appeal of the expulsion examiner's decision. As part of the intermediate appellate process, the Schools provided to Ms. Landis and D.L. the accusers' names, the videotape, and the students' original statements. The intermediate hearing officer gave D.L. until noon on April 21 to file any additional evidence or information based upon these disclosures. The plaintiffs' attorney responded with a letter challenging the legality of the intermediate appeal, the procedures employed at the February 28 hearing, and the sufficiency of the evidence to support a finding that D.L. was involved in any way. The court was told at the April 24 trial of this matter that the intermediate hearing officer had ruled in the Schools' favor.

D.L. and Ms. Landis contend that they should have been allowed to cross-examine the students whose statements were used in the February 28 hearing,

6

and that they should have been allowed to view the videotape so they could cross-examine Mr. Ferber about it. The Schools contend that D.L. received all the process due him, and that the Schools' disclosure of the withheld evidence as part of the intermediate appellate process provided D.L. and Ms. Landis with everything they asked for.

Indiana provides its children with a right to a public education, IND. CONST. art. 8 § 1, and that property interest triggers the Fourteenth Amendment's Due Process Clause, which assures a student facing expulsion, at a minimum, notice of the charges against him, notice of the time of the hearing, and a full opportunity to be heard. Remer v. Burlington Area Sch. Dist., 286 F.3d 1007, 1010-1011 (7th Cir. 2002). Still more may be required in a given case involving expulsion, *see* Goss v. Lopez, 419 U.S. 565, 584 (1975), and D.L. contends this is such a case. "Once it is determined that due process applies, the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). In determining what process is due in a given case, courts consider the private interests the state action affects, the risk of an erroneous deprivation posed by the proposed procedures, and the government's interest. Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

D.L.'s argument turns on the proposition that in his circumstances, the Due Process Clause provided him with a right of confrontation of witnesses. He contends he should have been allowed to confront the students who had given statements, both to better understand what the students were saying, and to

7

challenge their motivations and veracity. He says he should have been allowed to view the videotape so he could question Mr. Ferber more intelligently concerning its contents.

This court recently considered the matter of confrontation of witness in a school expulsion setting in two separate cases. In <u>B.S. ex rel. Schneider v. Board of Trustees, Fort Wayne Comty. Sch.</u>, 255 F. Supp.2d 891 (N.D. Ind. 2003), a high school student who had been suspended for engaging in sexual conduct at the school argued that he should have been allowed to cross-examine his alleged partner and the accusing students. In <u>Wagner v. Fort Wayne Com'y Sch.</u>, 255 F. Supp. 2d 915 (N.D. Ind. 2003), a middle school student who had been suspended for distributing caffeine pills at school argued that she should have been allowed to know the identities of, and cross-examine, the students who had given statements. This court disagreed with both students.

In both <u>B.S.</u> and <u>Wagner</u>, the court evaluated the first <u>Mathews</u> factor (the private interest being affected)—the right to a public education—as "strong," 255 F. Supp. 2d at 899, 926, and D.L.'s interest is no weaker. If anything, D.L.'s interest may be greater because of the impact of the Schools' decision on his eligibility for a Twenty-first Century scholarship.

In both <u>B.S.</u> and <u>Wagner</u>, this court found the risk of erroneous deprivation of that interest through procedures that do not include confrontation to be very low. <u>Id</u>. In both cases, the court accurately noted that "the clear weight of authority holds that a student facing an expulsion hearing does not have the right

8

to cross-examine witnesses or even learn their identities." Id. The state of that law is no different today than it was when this court made that observation three years ago.

In B.S., the student argued that his case differed from others because cross-examination might have tested his alleged sexual partner's reliability and disclosed motivation to fabricate. The court rejected those arguments because the reliability of the other student's identification wasn't in issue and because motivation to falsify addressed credibility rather than reliability. 255 F. Supp. 2d at 899-900. In both cases, this court noted that the school administrators could be assumed, by virtue of their familiarity with the students involved, to be able to judge credibility without the benefit of cross-examination. 255 F. Supp. 2d at 900, 927.

D.L. argues that his case differs from B.S. and Wagner because his case presents no corroboration for the hearsay information that was presented to the hearing officer. In B.S., this court noted corroboration in the form of B.S.'s statements to school officials and another student, and the alleged partner's "catalogue of sexual encounters with 12 male students . . .." 255 F. Supp. 2d at 900. In Wagner, the anonymous student statements were consistent with each other.

D.L. is correct that the student statements in his case are less consistent than they apparently were in Wagner, though when one sees the handwritten papers (which were not shown to D.L. or his mother at the hearing), they seem

9

more consistent than D.L. believed. The alleged seller (D.G.) said he was sitting with D.L. and another student suspected to have been involved in the marijuana transaction (T.M.), who told him there was some weed in T.M.'s binder that he should look at; he said that as he was leaving, he heard D.L. say he was going to go get high for 5th period. T.M. said D.L. pulled marijuana from D.L.'s left pocket and told T.M. to sniff it.

    Another student said he saw D.L. pull something from his pocket and sniff it, that he saw brown material in a baggie in T.M.'s notebook, and heard a student tell D.L."That's enough to get you high." Another student said D.L. told T.M. that T.M. could get some from D.G. and to D.G. in the lower cafeteria; D.L. went for D.G. and brought him to the table, where T.M. asked D.G. how to get some, to which D.G. said they could do it right now and asked for T.M.'s binder; D.G. moved something from his pocket into T.M.'s binder; D.L. commented that T.M. didn't get as much as D.L., but T.M. said that was enough to smoke and was more than it looked like; D.L. showed T.M. his own marijuana.

    Still another student said he saw D.L. take a green leafy substance in a plastic bag from his pocket, smell it, then return it to his pocket; the same student said he heard T.M. ask D.G. what he could get for certain amounts of money and heard D.L. advise care because the camera would see what they were doing." Another student said she heard D.G. and T.M. talking about drugs and saw D.G. take marijuana from his pocket and place it in T.M.'s pencil pouch. Finally, another student said she heard D.G. discussed money with T.M., saying he had

already paid T.M. the day before; she said a little plastic bag was in the binder, that D.G. took drugs from his pocket, and that she heard D.L. say something about getting high before fifth period.

To the extent the typed, unsigned versions of the statements (the court assumes these were used to conceal the identities of the student-witnesses) were unclear or confusing to D.L. or his mother, Mr. Ferber was present at the hearing, under oath, and in possession of the originals. During the hearing, D.L.'s mother expressed concern that the typed version of D.L.'s statement might be incomplete, and Mr. Ferber read the original aloud. If D.L. and his mother were confused by the typed version of the statements, it was not due to lack of confrontation or cross-examination.

D.L. refers to Mr. Ferber's description of the videotape as hearsay, but this is not a matter of repeating what others said. In a practical sense, Mr. Ferber's testimony of what he saw on the videotape is no less a matter of personal knowledge than would have been his testimony of what he saw in the cafeteria (had he been present). His testimony of the videotape's contents might run afoul of a best evidence rule, *see* FED.R.EVID. 1002 *and* IND.EVID.R. 1002, but no such rule governs school disciplinary proceedings. Because Mr. Ferber was present and under oath, D.L. had the opportunity to cross-examine. Certainly, a prior viewing of the tape might have provided a better opportunity, but D.L. had an opportunity to question Mr. Ferber—an opportunity that went well beyond D.L.'s telling his own side of the story.

To the extent the videotape showed conduct by D.L. that was consistent with the students' statements, the evidence of the videotape provided the sort of corroboration that was present in Wagner. Mr. Ferber testified about what the videotape showed, and described conduct—pointing to D.G., escorting T.M. to D.G., smelling his hand, holding a chair to block the surveillance camera—consistent with the students' statements. Neither the expulsion examiner nor the court have viewed the videotape, but the expulsion examiner heard (and the court read) Mr. Ferber's testimony about the videotape. D.L. implies that the expulsion examiner could not permissibly find what the videotape showed, but Mr. Ferber's testimony supports her findings. Even after viewing the videotape, D.L. and his mother haven't pointed out any inconsistencies, so the court has no reason to think Mr. Ferber was mistaken or deceptive about what he saw in the videotape.

D.L. also suggests that his case differs from others because all the evidence was presented through a single witness, Mr. Ferber, who simply summarized what he saw (on the videotape) and heard (from other students). D.L. does not, though, offer any basis for the court to think such a scenario unique in school disciplinary settings. *See* Remer v. Burlington Area Sch. Dist., 286 F.3d 1007 (7th Cir. 2002) (all evidence of guilt presented by principal, who was intended target of alleged student conspiracy to shoot several school officials).

For these reasons, the court concludes under the second Mathews v. Eldridge factor that under the specific circumstances of D.L.'s case, the procedures the Schools employed did not pose a great risk of an erroneous

12

deprivation of D.L.'s property interest in a public education or his interest in a Twenty-first Century scholarship.

Access to the videotapes and confrontation of the students (or at least access to the students' identities) might well have lessened the risk of erroneous deprivation. As to the importance criminal courts place on cross-examination as a tool for reliable fact-finding, see <u>Crawford v. Washington</u>, 541 U.S. 36, 49-57 (2004); *see also* 5 WIGMORE, EVIDENCE § 1367, at 32 (Chadbourn rev. 1974) (describing cross-examination as the "greatest legal engine ever invented for the discovery of truth" and "the great and permanent contribution of the Anglo-American system of law to improved methods of trial procedure"). But the government has legitimate interests that weigh against its use in school disciplinary proceedings. Other courts have noted the significant governmental interests in protecting the identities of students who tell school officials of illegal student activities, <u>Newsome v. Batavia Local Sch. Dist.</u>, 842 F.2d 920, 924-925 (6th Cir. 1988), and the high cost of converting school disciplinary actions into something akin to adversary litigation with cross-examination, <u>Osteen v. Henley</u>, 13 F.3d 221, 225 (7th Cir. 1993). There may well be cases in which the student's property interest and the risk of erroneous deprivation combine to require a school corporation to bear such costs, but D.L. has not persuaded the court that this is such a case.

The disciplinary proceedings the Schools used in this case provided D.L. and his mother with notice of the charges against him, notice of the time of the

13

hearing, and a full opportunity to be heard. Allowing D.L. and his mother to see the videotape of the incident for which D.L. was suspended, or allowing D.L. and his mother to cross-examine or know the identities of the students who had given statements to the Schools, would not have appreciably reduced the risk of an erroneous deprivation of D.L.'s property interest in a public education, and would have impinged unnecessarily upon the Schools' interest in informal disciplinary proceedings that protect the anonymity of student informants. The process afforded to D.L. and his mother accorded fully with the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and the Schools are entitled to judgment on the plaintiffs' complaint.

SO ORDERED.

ENTERED:   May 3, 2006

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

cc:   J. Bowie-Suess
T. Wheeler